```
 1   STATE OF MINNESOTA                      DISTRICT COURT

 2   COUNTY OF POLK                    NINTH JUDICIAL DISTRICT

 3

 4   State of Minnesota,            ) File No. 60-CR-06-8233
                                    )
 5                      Plaintiff,  )
                                    )
 6             vs.                  )        TESTIMONY OF
                                    )    GREGORY SKIPPER, M.D.
 7   John Gerard Miller,            )
                                    )
 8                                  )
                        Defendant.  )
 9
                     -------------------
10

11          The above-entitled matter came on for hearing

12   before the Honorable Tamara L. Yon, one of the judges of

13   the within court, in the courtroom in the courthouse at

14   Crookston, Minnesota, on September 29, 2010.

15          Mr. Greg Widseth, County Attorney in and for

16   said County of Polk, appeared on behalf of the State of

17   Minnesota.

18          Mr. Eric Gudmundson, Assistant Public

19   Defender for the Ninth Judicial District, appeared on

20   behalf of the Defendant, who was also present in court.

21          THEREUPON, the following proceedings were

22   had:

23

24

25
```

EXHIBIT G

```
 1                        I N D E X
 2   WITNESS:                                          PAGE NO.
 3   GREGORY SKIPPER, M.D.
 4       Direct Examination by Mr. Gudmundson  - - - - -  3
 5       Cross-Examination by Mr. Widseth      - - - - - - - 23
 6
 7
 ...
25
```

```
 1              GREGORY E. SKIPPER, M.D.,
 2   being first duly sworn, was examined and testified by
 3   telephone as follows:
 4              THE COURT:  I'm going to turn it over to
 5   Mr. Gudmundson.
 6                                       DIRECT EXAMINATION
 7   BY MR. GUDMUNDSON:
 8       Q.  Good afternoon, Dr. Skipper, and thank you for
 9   your time.
10       A.  Good afternoon.
11       Q.  Can you state your full name for the record?
12       A.  Gregory E. Skipper, M.D.
13       Q.  And where are your offices located?
14       A.  I'm located in Montgomery, Alabama, at 19 South
15   Jackson Street.
16       Q.  Can you tell the Court a little bit about your
17   current position and occupation?
18       A.  I'm the medical director of the Alabama Physician
19   Health program, a program established by the medical
20   regulatory board in Alabama.  We -- I oversee the
21   program that intervenes on and monitors troubled
22   physicians and I also do that same work for the
23   veterinary board for the doctors of veterinary medicine.
24       Q.  When you say troubled physicians, what do you
25   mean?
```

1   A.   Most of them have substance abuse problems that
2  are referred to us, but we also work with psychiatric
3  problems and some other issues around anger and so
4  forth.
5   Q.   Okay.  And we do have your curriculum vitae here.
6  Can you tell the Court a little bit about your training
7  and experience that has led you to this point?
8   A.   Sure.  Well, let's see, I went to medical school
9  at the University of Alabama and did internal medicine
10 training in San Diego, a long time ago.  And then I
11 practiced internal medicine in, actually near Portland,
12 Oregon for about 15 years.  And I got interested in this
13 whole area of physician health and started working at an
14 evaluation and treatment program in my -- near my
15 community called Springbrook and so I ended up becoming
16 medical director there in 1995 and then in 1999 I took
17 this job here in Alabama overseeing the physician health
18 program.
19      I, along the way I've gotten Board certified
20 in internal medicine and addiction medicine and I've
21 become very interested in and an expert in interpreting
22 drug tests, so I'm a medical review officer.  And I
23 actually have contracts with ten other regulatory
24 boards.  Some are nursing boards and other medical
25 boards, helping them with their interpretation of drug

1   testing.
2       Q.  And one of the testing or the screening
3   procedures that you use I believe is EtG testing, is
4   that correct?
5       A.  That's correct.
6       Q.  Can you tell the Court a little bit about, you
7   know, your history with this type of testing and how you
8   use it in your everyday practice?
9       A.  Sure.  Well, I was instrumental in bringing the
10  test to the United States.  It was back in 2001 I was at
11  a conference and met a Swiss researcher who was showing
12  slides of markers for alcohol use and I noticed that
13  this one stayed positive for up to a few days after
14  drinking and I was interested in using that in our
15  program because we needed this test and it turns out a
16  lot of people need that test.  Anyway, initially it was
17  just concern for some of the doctors that I was
18  monitoring.  They were having trouble getting
19  malpractice insurance because we couldn't prove they
20  stayed sober.
21          And I talked to a lab and first we did the
22  tests from Germany.  It was the only place in the world
23  that did the test at that time, but eventually I met
24  with a lab in Philadelphia and they started doing it now
25  and it rapidly spread and lots of places are doing the

1  test and I continued to participate in the research on
2  that and sort of stayed up on all the, you know,
3  research and science on it and become, you know, very
4  interested in it.  And I continue to use it and we
5  monitor currently 250 health professionals in our
6  program and like I said, I've worked with other
7  programs.
8      Q.  So you use it basically, I assume, on a daily or
9  weekly basis in your practice?
10     A.  Really daily.  We do random testing on all our
11 docs and so we include this on all of the doctors.
12     Q.  Now, is this a voluntary program on behalf of the
13 doctors who are in this program?
14     A.  Some are voluntary, some have had interaction
15 with the regulatory board or they've been ordered into
16 our program in order to keep their license.  Some come
17 to us directly, in which case it's voluntary.  Voluntary
18 with a caveat that should they decide to leave, it has
19 to be reported to the Board, so it's kind of quasi
20 voluntary.
21     Q.  Now, when somebody is going to be subject to your
22 program and subject to this type of testing, are there
23 any -- is there any type of a warning or information
24 that you give them prior to their inclusion in this type
25 of program?

1    A.   We sure do and I think it's very important
2  because, you know, it has become known fairly rapidly
3  after the test was introduced that there are many, many
4  things around that cause positives because things
5  contain alcohol and so we meet with each participant in
6  our program and we review the things they should avoid
7  and they sign a contract with us agreeing to avoid all
8  these laundry lists of things that contain alcohol.
9    Q.   And I'm going to get to that in just a little
10 bit.  But in addition to your work with this testing
11 method every day, are you familiar with the literature
12 and the research that others have done in this area?
13    A.   I am.
14    Q.   And have you actually conducted studies and
15 published articles as well?
16    A.   I have.
17    Q.   And do you also -- are you also in charge of a
18 website that contains information for people on this
19 testing method?
20    A.   I am.  I do that website and I kept it as an
21 information source to decrease the number of questions
22 I'm asked.  I usually refer people there and ask them to
23 read that first which often answers their questions.
24    Q.   Are you on any boards or advisory committees or
25 anything like that that deal with this type of testing?

1   A.   Well, let's see, let me think for a second about
2   that.  I've been a consultant to numerous boards.  I was
3   for four years on the Center for Substance Abuse
4   Treatment National Advisory Council in Washington and we
5   discussed it occasionally there and I presented on it
6   then, but currently I'm not on any boards that directly
7   relate to this.
8   Q.   Were you involved in a, in the discussion that
9   led up to an advisory being issued by the Substance
10  Abuse and Mental Health Services Administration?
11  A.   I was.
12  Q.   And you're aware of that advisory, is that
13  correct, familiar with it?
14  A.   I am aware of it.
15  Q.   And has that advisory ever been withdrawn?
16  A.   No, it has not.  Still the same concerns exist.
17  Q.   And, again, we'll get into that a little bit more
18  specifically later, but in your opinion -- well, number
19  one, it hasn't been withdrawn, correct?
20  A.   Correct.
21  Q.   And in your opinion those same concerns that are
22  laid out in that advisory are still present today?
23  A.   They are.
24  Q.   And now before we get into some of the specifics
25  with this EtG testing, do you use it as -- you use it as

1  a tool, I assume, to ensure compliance for your doctors
2  in this program?
3      A.  We do.
4      Q.  If there are what would appear to be a positive
5  test, an indication that somebody might have consumed
6  alcohol, are there any confirmatory tests that you
7  currently do or looking into to confirm any suspicions
8  that you might have?
9      A.  For this test?
10     Q.  Well, confirmatory test in addition to the EtG,
11 EtS test?
12     A.  Yes, that gets to the point.  The thing that we
13 do is we consider a positive EtG and/or EtS we consider
14 a positive as a positive screen for possible drinking.
15 And what we do is we confront the individual
16 supportively with the hope that they will, you know,
17 admit drinking if they are drinking and about half of
18 our participants actually do admit drinking, so it's
19 useful in that way.
20         If they deny drinking, then currently our
21 standard of care is we do another test that we believe
22 is confirmatory for drinking.  It's called phosphatidyl
23 ethanol.  It happens to be a blood test that you can do
24 with a finger stick with blots of blood on filter paper
25 and send that in and a positive phosphatidyl ethanol we

1  consider proof of drinking and we advise the doctor.  In
2  our case we're working with doctors.  We advise them
3  that we are going to do that test and if they had been
4  drinking, it will show it.  And a number of them do
5  admit, a further number admit drinking, but if they
6  still deny drinking, we run the test and about ten
7  percent, ten, fifteen percent are coming out negative
8  with phosphatidyl ethanol.  And, you know, it does seem
9  to be a good test.  When it's positive, we've had a
10 number of other admissions of drinking following that.
11 So it's a confirmatory test for drinking and I can
12 explain why, if you're interested.
13     Q.  Yes.  Why wouldn't you just run this test instead
14 of the EtG or EtS then?
15     A.  Well, that gets to the whole question of how
16 pretty much all drug testing in the country works and
17 the way it works is that in almost every case, whether
18 we're looking for cocaine, marijuana, any drug, we run a
19 screening test that's really broad and picks up anybody
20 that's possibly been using marijuana or cocaine or
21 methamphetamines and that's called a screen and those
22 are cheaper and easier to do, but they're not proof
23 because being a screen makes them sensitive but not
24 specific.  And basically what that means is that they
25 pick up just about anything that can possibly look like

1   the drug.
2           And now some programs will confront the
3   individual at that point.  If they admit using, they
4   don't have to do the confirmation, but many programs
5   like ours work out a deal with the lab so that we skip
6   that step and we ask the lab to do a reflex
7   confirmation.  So that means in the lab if the test
8   shows up positive for, say, marijuana, they immediately
9   just send a sample over and they do a confirmation test.
10  The confirmation test is kind of the opposite.  It's
11  real focused on the molecules to prove that it's, say,
12  in that case marijuana but, you know, that's not a
13  practical test to use for everybody.
14          So that's an offensive way of drug testing
15  the person that it screens, followed by confirmation.
16  And we consider the test for EtG and EtS as a positive
17  screen now because it's not proof of drinking.  There's
18  plenty of things, lots of things that can cause a
19  positive other than drinking and they can add up and
20  give you various levels if you have more than one of
21  those things.  And so we're happy now that we have a
22  confirmation, which is this blood test.  It's a little
23  bit of trouble because you have to get a blood sample,
24  but most people are willing to pay for that if they feel
25  they've been falsely accused of drinking.  So I'm

1  encouraging programs to use that test.
2     Q.  Do you consider that confirmatory test that you
3  are talking about to be either more reliable or more
4  accurate than this EtG or EtS?
5     A.  I do.  I think it's more specific for drinking.
6     Q.  Did I hear you right that approximately ten
7  percent or more of positive EtG, EtS tests when you
8  attempt to confirm them through this blood test are
9  coming back negative for drinking?
10    A.  That's correct.
11    Q.  Well, that gets us to, I guess, the main reason
12 you're testifying here today is about these EtG and EtS
13 results and so just for full disclosure for the Court, I
14 believe I provided you with a copy of the lab report
15 from Redwood Toxicology, is that correct?
16    A.  You did.
17    Q.  And I believe I provided you with a letter that
18 doctor or not -- John Martin from Redwood Toxicology had
19 sent to Cassandra McCamy, the local probation agent here
20 some time ago?
21    A.  Yes.
22    Q.  And then just today I e-mailed you a copy of a
23 letter from Mr. Martin that he sent to Mr. Widseth, is
24 that correct?
25    A.  That's correct.

1  Q.  And then obviously we've had, I believe, three
2  telephone discussions about the nature of this
3  testimony, is that right?
4  A.  We have.
5  Q.  Now, specifically with respect to EtG testing, is
6  there any way for EtG to get into one's urine besides
7  the consumption of an alcoholic beverage?
8  A.  There is indeed.
9  Q.  Can you explain to the Court some sources for
10  what we I guess would call incidental exposure then?
11  A.  Right.  That's kind of the term we use,
12  incidental exposure to alcohol.  Basically there's just
13  many things that we discovered in the environment and in
14  people's lives that have alcohol in them.  Things like
15  mouthwash, many over-the-counter medications like cough
16  syrups or, you know, Nyquil, of course things like
17  communion wine are alcohol based.  Even non-alcohol wine
18  and beer have .5 percent alcohol.  Foods, foods can be
19  cooked, of course, with wine or fermented items like soy
20  sauce or whatever.  Some vinegars have fermented
21  alcohol, vanilla extract, and so forth, plus many
22  beverages.  Anything that's liquid with sugar in it such
23  as orange juice, apple juice, Coca-Cola, things like
24  that that have been opened and sit in the fridge, if
25  they're tested, they often have small amounts of alcohol

```
 1  in them because sugar plus yeast and yeast sort of seems
 2  to float around the environment in some way or another,
 3  gets in these things and can cause fermentation, can
 4  cause alcohol in those beverages.  Small amount, not
 5  enough to get a person drunk, but because EtS and EtGs
 6  are screens, they're very sensitive, they pick these
 7  things up.
 8            And then further, and a bit shockingly, we
 9  found that the vapor of alcohol even causes positive
10  EtG, which is a testament to how sensitive this test is.
11  So breathing things like hand gel, perfume, bug spray,
12  even, you know, gasoline that now has, most gasoline has
13  ten percent alcohol, even breathing those vapors can
14  cause a positive EtG and all of these things can be
15  added and so that's one of our concerns and why we warn
16  people to avoid these things.  Even then people eat out
17  and so forth and they don't know always what food is
18  cooked with and so forth, and so we've had difficulty
19  really eliminating all the sources of incidental
20  exposure.
21     Q.  Clearly there's quite a number of things in
22  anyone's daily life they could run into that would
23  contain ethanol?
24     A.  Correct.
25     Q.  And, specifically, have you done any work with
```

1  exposure to hand sanitizers?
2     A.  I have.  I was the first one to realize that they
3  may cause positives.  And do you want me to tell you
4  about that experience?
5     Q.  If you would, please.
6     A.  I had a number of people, in particular one, a
7  pharmacist, claiming that she thought her positive was
8  from using frequent hand gel.  All health agencies are
9  encouraging that between patients in the hallways of
10 hospitals and apparently in pharmacies and she said she
11 used it, you know, 12 to 20 times a day.  I was
12 skeptical, but I finally relented and decided to test
13 her.  So we put her in a treatment center where we
14 searched her and made sure no alcohol was around.  Did
15 an EtG test in the morning, let her use hand gel hourly
16 throughout the day on the first day, took an EtG in the
17 evening.  We did the same thing the second day, but
18 every half hour we allowed her to use it.  Both the
19 evening urine tests were positive for EtG.
20          We subsequently did a study with 24
21 volunteers at the University of Michigan because I was
22 still skeptical about this because data show that
23 alcohol did not get through the skin very well and so
24 when we did the study at the University of Michigan, we
25 had four groups.  One was a control group that had no

1  exposure.  We had one group that used hand gel in a
2  bathroom and they used it on their hands and they could
3  breath it in a bathroom because we wanted a closed
4  space, a small space.  And then we had somebody stand
5  next to them that did not touch it, but could breath it;
6  and then we had a group that used it under a hood, so
7  there was no breathing, just skin.  Anyway, through our
8  astonishment it was the two in the bathroom that were
9  positive.  So the breathing of it seemed to cause the
10 positives and not so much the skin exposure.
11           I subsequently did a more intensive study
12 with some medical students that I was working with and
13 had them use it every two minutes for an hour in a
14 closed room to see how high we could get the level from
15 just breathing and using it that frequently.  And so
16 that level was actually not as high as the level of the
17 pharmacist in the initial case, but we did see levels up
18 to nearly 800 nanograms per mL.
19    Q.  Now, are there differences among different people
20 and their biology, I guess, with respect to how they
21 metabolize EtG?
22    A.  Absolutely.  Absolutely.  These tests, the EtG
23 metabolizes alcohol.  It's a degradation product for
24 alcohol.  The enzymes that do that degradation, there
25 are actually multiple enzymes, variations on the same

```
 1   enzymes.  So people have what's called polymorphic.  So
 2   there's different of the same enzyme and they're all
 3   determined by genes.  Some people have more or less of
 4   those genes.  Some have none, by the way.  Some people
 5   don't make any EtG.  That's fairly rare and then some
 6   make it more avidly.  I call them hyper-producers
 7   because they make more.  And that difference can be
 8   quite broad, maybe 20 times more in some people it looks
 9   like than in others, and so it can be quite a variation.
10   And there are other things that affect those enzymes,
11   not just genes, but foods and medicines can either
12   increase activity of those enzymes or decrease them and
13   some diseases can affect those enzymes as well.  But the
14   bottom line is we get quite a variation between people
15   and their response given the amount of alcohol.
16              One study that a toxicologist friend of mine
17   named Tony Costantino, he had nuns in a convent who all
18   promised they didn't drink.  He had them swish and spit
19   Cepacol mouthwash.  And there were a dozen of these
20   women that did this and the variation was quite
21   dramatic.  The results were negative in some, 50, 100,
22   200 in some and one nun it was 350 that she got from
23   swishing and spitting Cepacol.  So the point is, there's
24   a wide variation in the number of positive and the value
25   of the positive tests.
```

1    Q.  Mr. Martin had testified and an exhibit was
2 introduced where he indicated that approximately .02 to
3 .06 percent of ingested ethanol is converted to ethyl
4 glucuronide for urinary extraction.  Are you aware of
5 any research or data that would suggest that it might
6 fall outside that range?
7    A.  Yes.  There's a researcher in Germany who was the
8 original guy that was doing these tests, a very good
9 scientist, who now has reported that up to some people
10 that he's tested have shown up to .4 percent of the
11 alcohol is converted to EtG.  So .02 to .4 would
12 probably be more accurate.  And, by the way, it's not
13 surprising that that number has gone up and probably
14 will go further up.  Mainly because as we look at more
15 people, we get the variance, you know, the biology
16 systems are kind of on a bell-shaped curve.  Most people
17 fall in the average, but just about everything we look
18 at in biology, there's people on the ends, you know, the
19 person who does much more, has much more of a certain
20 quality than others and others that have very little and
21 most are in the middle.  So, yeah, there has been new
22 data on that.
23    Q.  So if one converted EtG at a rate of .02 to
24 .06 percent versus .4 percent, would that change the --
25 depending on what percentage that one converted to EtG,