## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| John G. Miller, | Case No. 0:11-cv-00115 (DWF/LIB) |
| On behalf of himself and all others similarly situated | |
| Plaintiff,<br>v. | **REDWOOD TOXICOLOGY LABORATORY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS RULE 12(B)(6) MOTION TO DISMISS OR ALTERNATIVELY, FOR SUMMARY JUDGMENT** |
| Redwood Toxicology Laboratory, Inc., | |
| Defendant. | |

## <u>INTRODUCTION</u>

The Amended Complaint filed by Plaintiff John Miller ("Plaintiff") should be dismissed under Fed. R. Civ. P. 12(b)(6) because the claims asserted – both individually and on behalf of others "similarly situated" – fail as a matter of law.

Indeed, this Court has effectively held that Plaintiff's claims fail as a matter of law. By Order dated May 25, 2011, the Court denied Plaintiff's injunction motion and held:

> This record **does not demonstrate a likelihood of success** on Miller's claim that Redwood's statements are false or misleading.
>
> **Even if the Court were to view the record in the light most favorable to Miller, Redwood's statements would still not constitute actionable conduct**. To succeed on his CFA and FSAA claims, Miller must demonstrate that he was injured by Redwood's alleged misrepresentations.

The Minnesota Supreme Court has explained that in order to prove a claim for damages under the CFA or FSAA, a plaintiff "must establish a causal nexus between their alleged damages and the conduct of the defendants alleged to violate the statutes.  This causal nexus has a component of reliance . . . ."  Group Health Plan, 601 N.W.2d at 15.  **The current record contains no evidence that Redwood's statements have been relied upon**. Even if Miller's test result was the sole cause of his detention, the record before the Court does not show that it was Redwood, as opposed to a probation officer, the state court, or even Miller himself, that either caused the initial detention or caused the detention to continue for 135 days.

*(Docket No. 24, TRO Order (emphasis added).)*

The Court got it right in this Injunction Order.  Redwood's statements do **not** constitute actionable conduct.  And no amount of discovery will change this simple fact.  Quite simply, Miller cannot and will not show that he was harmed by Redwood's alleged misrepresentations, much less, that Redwood made misrepresentations.  This Court should dismiss under Rule 12 or, alternatively, under Rule 56.

More specifically, Plaintiff's claims for (1) violation of Minnesota's False Statement in Advertising law, Minn. Stat. § 325F.67 ("Count I"); (2) violation of Minnesota's Consumer Fraud Act, Minn. Stat. § 325F.69 ("Count II"); and (3) negligence ("Count III") all hinge on alleged false statements published on the website of Defendant Redwood Toxicology Laboratory, Inc. ("Redwood").  Plaintiff's Amended Complaint alleges that the following statements from Redwood's website are false and/or misleading and the direct cause of his claimed damages:

- EtG/EtS alcohol testing is "[i]deal for zero tolerance and abstinence situations."

- Redwood's urine analysis test uses the "most sophisticated, sensitive, and specific equipment and technology available."

- Redwood's EtG/EtS testing provides "highly accurate" results.

- ETG "is only detected in urine when ethanol has been ingested," and any EtG level over 100 ng/mL is the "most definitive" indicator that the specimen came from a person who has ingested alcohol.

- "The analytical methods used by Redwood are scientifically accepted and approved by the U.S. Department of Health and Human Services."[1]

Plaintiff cannot assert legally cognizable claims of false advertising, consumer fraud, or negligence because the statements cited above are factually accurate, and – in the case of words such as "most" and "ideal" – mere puffery.  Additionally, there is no causal nexus between Redwood's alleged misrepresentations and Plaintiff's incarceration or evidence of detrimental reliance by Plaintiff, Tri-County Community Corrections ("Tri-County), or any customer of Redwood.  Fundamentally, the accuracy of Redwood's testing is not being criticized.  Rather, Plaintiff criticizes Tri-County's use of certain EtG/EtS cut-off levels – a customer choice – as positive findings consistent with recent ethanol ingestion.  Ultimately, the determination that Plaintiff violated probation was made by Tri-County, **not** Redwood, and there is no evidence that any of Redwood's statements influenced Tri-County's decision to incarcerate Plaintiff.  What's more, Plaintiff lacks standing to pursue his statutory consumer fraud and false advertising claims because he has not and cannot show that his pursuit of these claims would benefit the public at large.

---

[1] In addition to the statements cited in Plaintiff's Amended Complaint, Plaintiff's Rule 65(b) motion criticized two other statements on Redwood's website as being false and/or misleading:  (1) Redwood's testing and methodology is "legally defensible"; and (2) "Are They Drinking?  We'll Find Out."  *(Docket No. 13, Plaintiff's TRO Brief at 13, 14.)*

Finally, although Plaintiff seeks to represent a class under Fed. R. Civ. P. 23, Plaintiff's generalized and conclusory class allegations fall flat. Plaintiff has put forth only threadbare recitals of the prerequisites to class certification, and lacks sufficient factual allegations to establish the class claims alleged.

Put simply, Plaintiff's generalized and conclusory allegations – both individually and on a representative basis – fail to state a claim upon which relief can be granted. Accordingly, this Court should grant Redwood's Motion to Dismiss in its entirety and with prejudice.

## STATEMENT OF FACTS

### A. Redwood Toxicology Laboratory

Redwood performs numerous toxicological drug and alcohol tests including EtG/EtS urine tests at the request of its customers nationwide. (*Ross Decl.*; *Docket No. 24, TRO Order at 2.*)[2] EtG/EtS testing involves the analytical measurement of EtG (ethyl glucuronide) and EtS (ethyl sulfate), two direct metabolites from ethanol that can be found in urine up to three to four days after ethanol is ingested. *Id.* EtG and EtS can only be found in urine if ethanol has been ingested. *Id.* The CLIA – 88 (Clinical Laboratory Improvement Act), 42 C.F.R. § 493 *et seq.*, approves of the LC/MS/MS (liquid

---

[2] All affidavits, declarations, and exhibits referenced herein are already on file with the Court as attachments to Plaintiff's Complaint or in support of the parties' memoranda in support of and opposition to Plaintiff's Rule 65(b) Motion. As discussed in more detail herein, this Court may consider materials already part of the record in this case without converting Redwood's Motion to Dismiss into a motion for summary judgment. *See, e.g.* Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999).

chromatography/mass spectrometry/mass spectrometry) testing methodology used by Redwood in testing for and measuring EtG/EtS.  (*Ross Decl.*)

EtG/EtS testing is well known and commonly used.  It is used at commercial forensic laboratories and most SAMHSA (Substance Abuse and Mental Health and Human Services Administration) laboratories throughout the country.  *Id*.  Most courts (including state and federal courts in Minnesota), probation departments, treatment programs, and professional mentoring programs (*e.g.*, pilots, nurses, etc.) support the use of EtG/EtS testing in zero tolerance situations.  *Id.*

In the field of forensic toxicology, there are certain terms of art that are significant.  "Ethanol" is a chemical compound (ethyl alcohol) found in various household products, liquids, solids, and gels.  *Id.; (Docket No. 24, TRO Order at 2.)*  Ethanol is found in fermented alcohol products such as beer, wine, and distilled liquors.  *Id.*  "Alcohol" refers generally to all types of alcohol compounds such as ethanol, isopropanol, methanol, etc.  *Id.*  "Ingestion" is a more universal term encompassing the presence of an ethanol compound in the body from any means or source (oral, nasal, dermal, intravenous, etc.), whereas "consumption" refers exclusively to oral consumption (drinking).  *Id.*

The U.S. Department of Health and Human Services ("HHS") has licensed the methodology used by Redwood in testing for and measuring EtG/EtS since 2006, when Redwood first started this testing.  *Id.*  HHS reviews Redwood's scientific procedures, documentation, and personnel every two years.  *Id.;* (*See also Redwood Ex. 1, License from HHS indicating current good standing*.)  Because of the HHS' inspection and approval of Redwood's analytical methods – including the LC/MS/MS method it uses to

screen, confirm, and quantify EtG/EtS – Redwood states on its website that ***"RTL utilizes the most sophisticated, sensitive, and specific equipment and technology available, LC/MS/MS, to screen, confirm, and quantitate EtG/EtS,"*** and that ***"[t]he analytical methods used by RTL are scientifically accepted and approved by the U.S. Department of Health and Human Services."*** *(See Ross Decl.; Plaintiff's Complaint Ex. A, B (Emphasis added).)* In addition, several other state and national organizations have recognized Redwood's compliance with industry requirements and procedures for EtG/EtS testing. *(Ross Decl.; see also Redwood Ex. 2, Redwood website page*[3] *identifying various certifications and licenses.)*

Because of Redwood's compliance with accepted testing methods, confirmed by outside third parties such as HHS, Redwood states in its materials that EtG/EtS testing provides ***"highly accurate"*** results. *(Emphasis added.)* *(See Ross Decl.; Plaintiff's TRO*

---

[3] Because Plaintiff's Amended Complaint (1) references Redwood's website, and (2) attaches select pages from Redwood's website (Plaintiff Complaint Exhibits A, B), this Court may consider the full scope of the content on Redwood's website in deciding Redwood's Motion to Dismiss without converting it to a motion for summary judgment. See, e.g., Kushner v. Beverly Enters., 317 F.3d 820, 831 (8th Cir. 2003) (quotation omitted)("When deciding a motion to dismiss, a court may consider the complaint and documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading."); Silver v. H & R Block, Inc., 105 F.3d 394, 397 (8th Cir. 1997) (holding that statements selectively quoted in a pleading may be submitted in full without converting a motion to dismiss into a summary judgment motion when plaintiff's "entire lawsuit is based only on the statements, and he does not dispute their content").

*Ex. E.*)  Redwood toxicologists have testified concerning EtG/EtS test results in numerous states across the country, and the testimony and testing results have always been admitted into evidence and have never been excluded.  *(Ross Decl.)*  For this reason, as well as those stated above, Redwood states on its website that: "We deliver the certainty of science, the dependability of proven drug screening processes and the assurance of ***legally defensible results.***"  (*Emphasis added*.)  (*Id.*; *see also Plaintiff's TRO Ex. D*.)

Redwood's test results provide a valuable service to its customers, many of whom are employing zero tolerance and abstinence requirements.  (*Ross Decl.*)  As referenced in the EtG/EtS Alcohol Testing Laboratory Services Brochure, Frequently Asked Questions *(Plaintiff's TRO Exhibit E)*, EtG/EtS testing doubles the time for detection because EtG can be detected in urine for up to 80 hours after ingestion.  Redwood's brochure notes that various cut-offs are suggested for use in EtG testing, but explains that any EtG level above 100 ng/ml and EtS level over 25 ng/ml "indicates exposure to ethanol."  Redwood's brochure explains that using a 100 ng/ml cut-off for EtG and a 25 ng/ml cut-off for EtS detection is "superior for monitoring purposes" and provides alcohol abstinence programs with ***the best and most definitive test available***" to indicate whether recent ethanol ingestion has occurred.  *Id.*  For these reasons, Redwood states on its website that EtG/EtS testing is ***"[i]deal for zero tolerance and abstinence situations"*** and it also developed the tag-line ***"Are They Drinking? We'll Find Out." (Emphasis added.)*** *Id.*; (*See also Plaintiff's Complaint Ex. A.*)

Customers specify the EtG/EtS cut-off level they want for positive findings. *(Ross Decl.; see also Plaintiff's Complaint Ex. B, Redwood website page alerting customers that "some cut-off levels may differ for your agency" and stating that each agency "has the ability to choose" what cut-off levels indicate positive findings.)* Tri-County is a customer of Redwood, and as such controls the manner and means of Redwood's performance. *(Ross Decl.)* In its initial correspondence with Redwood, Tri-County had the option to elect a higher cut-off, but instead elected to use a cut-off of EtG above 100 ng/ml and EtS above 25 ng/ml as a positive finding consistent with recent ethanol ingestion. (*Ross Decl.; see also Plaintiff's Complaint Ex. B.*) To date, Redwood continues to provide EtS/EtG testing services to Tri-County in accordance with Tri-County's specific dictates.

The only way a test subject can have EtG/EtS in the urine is if ethanol is in the subject's body. (*Ross Decl.*; s*ee also Plaintiff's TRO Ex. E; Docket No. 24, TRO Order at 2.)* Redwood does not offer any definitive opinion on actual ethanol consumption (drinking). (*See Ross Decl.*) Instead, Redwood cautions that, "[a]s is the case with any laboratory test, it is also very important to obtain clinical correlation" *Id*.; (*See also Plaintiff's TRO Ex. E.*) Clinical correlation means knowledge of a test subject's medical history, alcohol consumption history and/or abuse, DUI convictions and/or alcohol related convictions, and other indicators of alcohol abuse. (*See Ross Decl.*) This second step of clinical correlation is important because the cut-off numbers are only analytical determinations of ethanol ingestion and are not diagnostic in nature. *Id.; (Plaintiff's TRO Ex. E.)* For this reason, Redwood offers opinions on whether the test results are

8

consistent or inconsistent with the ingestion of ethanol, *not* on what the specific sources

of the ethanol are (*i.e.*, whether from drinking alcohol or incidental exposure).  *Id.*

      Incidental exposure to alcohol can create EtG concentrations in excess of 100

ng/ml and this possibility is specifically discussed on Redwood's website.  (*See Ross*

*Decl.; Plaintiff's TRO Ex. E.*)  "Incidental exposure" is a term of art in the field of

toxicology and refers to chronic exposures to products and substances that contain

ethanol such as hand sanitizers, mouthwash, cough syrups, and some food products such

as vanilla extract.  *Id.*  As Redwood advises in its literature, products containing alcohol

such as mouthwash, Nyquil, and over-the-counter medications could produce a positive

test for ethanol and EtG/EtS.  *Id*.

      Plaintiff's original Complaint references and attaches an Advisory Opinion

published by SAMHSA and suggests that it is authoritative on the validity of EtG/EtS

testing.  *(See Plaintiff's Complaint Ex. D; Plaintiff's TRO Ex. H.)*  However, on the last

page of the Advisory Opinion, it states that "the views expressed in the Advisory Opinion

do not reflect the views of SAMHSA or the United States Department of Health and

Human Services."  *Id*.  SAMHSA is an organization that regulates several drugs, but not

ethanol. *(Ross Decl.)*  It does not have jurisdiction or oversight power over Redwood or

testing methods for ethanol generally.  *Id.*

   **B.  <u>Plaintiff John Miller and his Probation Violation Hearing</u>**

      On January 25, 2008, Plaintiff was placed on supervised probation for seven years

in connection with a DUI-related charge pursuant to a plea agreement.  *(Plaintiff's TRO*

*Ex. F.)*  Under the terms of this plea agreement, Plaintiff agreed to refrain from

intentionally ingesting or possessing alcohol or controlled substances, and agreed to submit to random drug and alcohol testing. *Id.; (Docket No. 5, Amended Complaint at ¶ 11.)* On March 6, 2010, Plaintiff suffered an admitted relapse in connection with his use of alcohol. *(Miller Aff.)* On May 10, 2010, a report was filed alleging Plaintiff violated probation by consuming alcohol and other violations. *(Plaintiff's TRO Ex. F.)* After initially denying the violations, Plaintiff later admitted them and the Court reinstated Plaintiff's probation on May 10, 2010. *Id.*

On June 15, 2010, Plaintiff reported to a scheduled probation meeting and submitted a urine sample to his probation officer. (*Miller Aff; Docket No. 5, Plaintiff's Amended Complaint at ¶ 13.*) Plaintiff's probation officer thereafter submitted the urine sample to Redwood for testing in accordance with Tri-County's practice and agreement with Redwood. *(Miller Aff.; Plaintiff's TRO Ex. F; Docket No. 5, Plaintiff's Amended Complaint at ¶ 14.)* Plaintiff paid Tri-County for the cost of this test. (*Miller Aff. and Ex. A attached to Miller Aff; Docket No. 5, Plaintiff's Amended Complaint at ¶ 15.)* The test results provided by Redwood to Tri-County showed that Plaintiff had a positive EtG of 1130 ng/ml (1030 ng/ml over the 100 ng/ml cut-off) and a positive EtS of 603 ng/ml (578 ng/ml over the 25 ng/ml cut-off). *(Redwood Ex. 3; Miller Aff.; Plaintiff's TRO Ex. F at 2; Docket No. 24, TRO Order at 3.)* A probation violation report was subsequently filed alleging that Plaintiff violated probation by using alcohol. *(Plaintiff's TRO Ex. F.)*

Plaintiff had a probation violation hearing on September 29, 2010, after two continuances. *Id.* Conflicting expert opinion testimony was presented at this hearing. (*See Plaintiff's TRO Ex. A, G; Docket No. 24, TRO Order at 3-5.)* Plaintiff maintained

10

that the EtG/EtS test results were due solely to incidental exposure to alcohol from lacquer and hand sanitizer.  *(Docket No. 5, Plaintiff's Amended Complaint at ¶ 17; Miller Aff.; Plaintiff's TRO Ex. F at 2.)*  On behalf of the State of Minnesota, Mr. Martin of Redwood discussed reports and studies that concluded that EtG concentrations in excess of 500 ng/ml were inconsistent with incidental exposure only.  *(Plaintiff's TRO Ex. A at 14, 17-18, 26.)*  Dr. Skipper disagreed with Mr. Martin's opinion testimony and testified that an EtG result of 1130 such as Plaintiff's was not clear and convincing evidence that Plaintiff was drinking.  *(Plaintiff's TRO Ex. G at 22-23.)*[4]  Dr. Skipper did note that he was unaware of any scientific studies finding that hand sanitizer alone could get EtG results in excess of 1000 ng/ml as occurred here.  *Id.* at 28.  In fact, the highest test result from hand sanitizer alone found by Dr. Skipper was a reading in the 700's, well below the 1130 as found in Mr. Miller's urine.  *Id.* at 27-28.

Based on this conflicting expert testimony and Plaintiff's testimony at trial that he was exposed to significant amounts of alcohol from hand sanitizers and lacquer in the days before the test, the court concluded that the State failed to establish Plaintiff's probation violation by clear and convincing evidence.  *(Plaintiff's TRO Ex. F; Docket No. 24, TRO Order at 5.)*  The court expressly noted that, despite conflicting testimony, it was not critical of the test itself, stating "[t]he Court is not holding that EtG/EtS test[s] are now inaccurate or invalid, or that probation must now do a confirmatory PEth blood

---

[4] Dr. Skipper once held the opinion that EtG in excess of 500 ng/ml would mean that incidental exposure was extremely unlikely. *(Plaintiff's TRO Ex. G at 27.)*  He recently changed his mind and no longer holds that opinion. *Id.*

test for alcohol screenings.  The Court simply finds that in this case, with the credible

evidence present of the Defendant's overwhelming incidental exposure to alcohol, the

State had not met its burden of proof." *(Plaintiff's TRO Ex. F.)*

### C. <u>Procedural Posture</u>

On January 18, 2011, Plaintiff filed this lawsuit against Redwood in U.S. District

Court, District of Minnesota, alleging seven separate causes of action. *(Docket No. 1,*

*Complaint.)*  Prior to Redwood answering the Complaint, Plaintiff amended his

Complaint to allege a proposed class action on behalf of himself and others similarly

situated, now asserting three causes of action:  (1) violation of Minnesota's Consumer

Fraud Act, Minn. Stat. § 325F.69; (2) violation of Minnesota's False Statement in

Advertising law, Minn. Stat. § 325F.67; (3) and common law negligence. *(Docket No. 5,*

*Amended Complaint.)*  The parties stipulated and agreed that Redwood would have until

April 20, 2011, to answer or otherwise respond.  *(Docket No. 8, Stipulation.)*

On April 20, 2011, Redwood filed a Notice of Motion and Motion to Dismiss.

*(Docket Nos. 11, 12, Notice of Motion and Motion to Dismiss.)*  On April 25, 2011,

Plaintiff filed a Motion for Temporary Restraining Order, Injunctive Relief, and

Expedited Discovery, seeking to enjoin Redwood from making certain representations in

its advertising and marketing materials pending determination of this action and alleging

that immediate action was necessary because he was still subject to parole and thus could

potentially fail a urine test and be incarcerated again or lose his job in the future.  A

hearing on Plaintiff's motion took place before this Court on May 17, 2011, and

Plaintiff's Rule 65(b) motion was denied in full in the Injunction Order dated May 25, 2011.  In pertinent part, this Order held:

> This record **does not demonstrate a likelihood of success** on Miller's claim that Redwood's statements are false or misleading.
>
> **Even if the Court were to view the record in the light most favorable to Miller, Redwood's statements would still not constitute actionable conduct**.  To succeed on his CFA and FSAA claims, Miller must demonstrate that he was injured by Redwood's alleged misrepresentations. The Minnesota Supreme Court has explained that in order to prove a claim for damages under the CFA or FSAA, a plaintiff "must establish a causal nexus between their alleged damages and the conduct of the defendants alleged to violate the statutes.  This causal nexus has a component of reliance . . . ." <u>Group Health Plan</u>, 601 N.W.2d at 15.  **The current record contains no evidence that Redwood's statements have been relied upon**. Even if Miller's test result was the sole cause of his detention, the record before the Court does not show that it was Redwood, as opposed to a probation officer, the state court, or even Miller himself, that either caused the initial detention or caused the detention to continue for 135 days.

*(Docket No. 24, TRO Order (emphasis added).)*

## LEGAL STANDARD

Plaintiff's Amended Complaint should be dismissed in its entirety.  Each count raised by Plaintiff fails to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (abrogating the "no set of facts" standard for Fed.R.Civ.P. 12(b)(6) found in <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).  <u>Twombly</u>

applies to Rule 12 motions.  <u>Peterson v. Argent Mortgage Co.</u>, 2007 WL 1725355, *1 (D.

Minn. June 14, 2007).[5]  Under <u>Twombly</u>,

> a plaintiff's obligation to provide the grounds of his entitle[ment] to relief
> **requires more than labels and conclusions, and a formulaic recitation**
> **of the elements of a cause of action will not do * * *.**  Factual allegations
> must be enough to raise a right to relief above the speculative level * * * on
> the assumption that all the allegations in the complaint are true.

<u>Twombly</u>, 127 S. Ct. at 1964-65 (emphasis added); <u>see also</u> <u>Peterson</u>, 2007 WL 1725355,

*1.  Thus, a complaint cannot simply "le[ave] open the possibility that a plaintiff might

later establish some set of undisclosed facts to support recovery."  <u>Twombly</u>, 127 S. Ct.

at 1968.  Rather, the complaint's facts must be sufficient to "nudge * * * claims across

the line from conceivable to plausible."  <u>Twombly</u>, 127 S. Ct. at 1974.

   The Supreme Court's recent decision in <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009),

shows that Plaintiff's conclusory allegations here cannot prevent Rule 12 dismissal.  In

<u>Iqbal</u>, the Court explained the <u>Twombly</u> standard as follows:

> Where a complaint pleads facts that are merely consistent with a
> defendant's liability, it stops short of the line between possibility and
> plausibility of entitlement to relief. * * * [T]he tenet that a court must
> accept as true all of the allegations contained in a complaint is inapplicable
> to legal conclusions.  Threadbare recitals of the elements of a cause of
> action, supported by mere conclusory statements, do not suffice. * * *.
> **While legal conclusions can provide the framework of a complaint,**
> **they must be supported by factual allegations.**

<u>Iqbal</u>, 129 S. Ct. at 1954 (emphasis added) (allegations that government "knew of,

condoned, and willfully and maliciously agreed to subject [Iqbal] to harsh conditions * *

---

[5] All unpublished opinions are attached to the Declaration of Hal A. Shillingstad
submitted herewith in support of Redwood's Motion to Dismiss.

* solely on account of [Iqbal's] religion, race, and/or national origin" were insufficient to nudge discrimination claims "across the line from conceivable to plausible").  Moreover, the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply here to Plaintiff's claims because "Rule 9(b) applies to both common law and statutory fraud claims made under Minnesota law where the gravamen of the complaint is fraud." Russo v. NCS Pearson, Inc., 462 F.Supp.2d 981, 1003 (D. Minn. 2006) (citations omitted). Accordingly, Plaintiff must set forth the "who, what, when, where and how" for each alleged fraud. Parnes v. Gateway 2000, Inc., 122 F.3d 539, 550 (8th Cir. 1997).

Although a court considering a Rule 12(b)(6) motion to dismiss typically must ignore materials outside the pleadings, it may consider materials that are "necessarily embraced by the pleadings," including **"matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint**." See Porous Media Corp, 186 F.3d at 1079 (emphasis added) (quoting Piper Jaffray Cos. V. Nat'l Union Fire Ins. Co., 967 F. Supp. 1148, 1152 (D. Minn. 1997) (relying on transcript of related proceeding in deciding defendant's motion to dismiss); 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 1357, at 229 (1990)); see also U.S. v. Xcel Energy, Inc., 759 F. Supp.2d 1106, 1118 (D. Minn. 2010); Noble Systems Corp. v. Alorica Central, LLC,  543 F.3d 978, 982 (8th Cir. 2008); Hintz v. JP Morgan Chase Bank, 2010 WL 4220486, *2 (D. Minn. Oct. 20, 2010) (considering publically-filed documents in deciding defendants' motions to dismiss).  Accordingly, without converting Redwood's motion into one for summary judgment, this Court may choose to rely on not only the exhibits attached to Plaintiff's Complaint, but also the

exhibits, affidavits, and declarations already filed with the Court by both parties in relation to Plaintiff's motion for injunctive relief and other matters of public record.

What's more, even if this Court elects to convert Redwood's Rule 12(b)(6) motion into one for summary judgment under Rule 56, no formal notice to the parties would be required because both parties here have constructive notice; *i.e.*, are well aware of the issues being determined and will have sufficient time and opportunity to file documents, affidavits, etc. in support of and in opposition to the motion to dismiss.  Fed. R. Civ. P. 12(d); see, e.g., Burham v. Humphrey Hospitality Reit Trust, Inc., 403 F.3d 709 (10th Cir. 2005); In re G.& A. Books, Inc., 770 F.2d 288 (2d Cir. 1985); Tri-Gen v. International Union of Operating Engineers, Local 150, AFL-CIO, 433 F.3d 1024 (7th Cir. 2006).

Under a Rule 56 analysis, Redwood is entitled to summary judgment because, when the evidence is viewed in the light most favorable to Plaintiff, there are no genuine issues of material fact and Redwood is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir. 1992).  Plaintiff, as a nonmoving party, should not be allowed to rest upon mere denials or allegations in the pleadings to survive summary judgment.  Fed. R. Civ. P. 56(e)(2).  A failure of proof regarding any essential element of Plaintiff's claims renders all other facts immaterial.  Celotex Corp v. Catrett, 477 U.S. 317, 322-23 (1986).

Plaintiff's Amended Complaint is replete with conclusory statements and fails to set forth the factual allegations – let alone the evidence – necessary to establish the claims alleged.  Because it appears on the face of Plaintiff's Amended Complaint that he

has not alleged a set of facts that entitle him to relief, Plaintiff's Amended Complaint should be dismissed in its entirety and Redwood's Motion to Dismiss should be granted in full.  Alternatively, this Court should grant Redwood motion for summary judgment because there is no evidence to support the requisite elements of Plaintiff's false advertising, consumer fraud, and negligence claims, and Redwood is entitled to judgment as a matter of law.

Discovery cannot and will not change the fundamental failures of Plaintiff's Amended Complaint.  And the Eighth Circuit law is clear – Rule 56 "does not require trial courts to allow parties to conduct discovery before entering summary judgment." U.S. v. Light, 766 F.2d 394, 397 (8th Cir. 1985) (affirming dismissal before discovery); Iverson v. Johnson Gas Appliance Co., 172 F.3d 524, 530 (8th Cir. 1999) (citations omitted) (discovery is not necessary "when the non-movant seeks to fish for a * * * violation"); see also Adams v. Resolution Trust Corp., 731 F. Supp. 352, 358, n. 10 (D. Minn. 1990) (treating defendant's Rule 12 motion as a motion for summary judgment and rejecting plaintiff's arguments that summary judgment was premature absent further discovery).

## **LEGAL ARGUMENT**

In his Amended Complaint, Plaintiff asserts false advertising, consumer fraud, and negligence claims against Redwood – all three stemming from allegedly false and misleading statements published on its website.  Critically, these claims are both legally and factually unsupported and unsupportable.

I.    **Plaintiff's Misrepresentation (*i.e.*, False Advertising and Consumer Fraud) Claims Fail.**

Minnesota's False Statement in Advertising law prohibits advertising via any medium that "contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading . . ." which is made "with the intent to sell or in anyway dispose of merchandise, securities, service, or anything . . . ." Minn. Stat. § 325F.67.  Similarly, Minnesota's Consumer Fraud Protection Act prohibits the use of "any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any" good or service.  Minn. Stat. § 325F.69.  This Court has recognized that the appropriate analysis for Minnesota consumer protection and false advertising claims – collectively referred to as "misrepresentation claims" – is the same analysis as that applied under the Lanham Act.  See Group Health Plan, Inc. v. Philip Morris USA, Inc., 344 F.3d 753, 757 (8th Cir. 2003); see also  Buetow v. A.L.S. Enterprises, Inc., 713 F. Supp. 832, 837 (D. Minn. 2010) (citing Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc., 83 F. Supp.2d 1016, 1022 (D. Minn. 2000)).

To prevail on a false advertising under the Lanham Act, a plaintiff must establish:

(1) that defendant made a false statement of fact in a commercial advertisement about its own or another's product; (2) that the statement actually deceived or would tend to deceive a substantial segment of its audience; (3) that the deception is material, in that it is likely to influence the purchasing decision; (4) that defendant caused its false statement to

enter interstate commerce[6]; and (5) that the plaintiff has been or likely to be injured as a result of the false statement . . . .

Surdyk's, 83 F. Supp. at 1022.  False statements sufficient to establish an actionable

misrepresentation claim fall into one of two categories:  (1) literally false commercial

claims, and (2) claims that may be literally true or ambiguous, but are misleading in

context or otherwise likely to deceive consumers.  Buetow, 713 F. Supp.2d at 837-38.

Many commercial claims actually fall into a third category of statements generally

termed "puffery" that are not actionable and consist of "exaggerated advertising,

blustering, and boasting upon which no reasonable buyer would rely."  See United

Industries Corp. v. The Clorox Co., 140 F.3d 1175, 1183 (8th Cir. 1998) (quotation

omitted).

When assessing a statement for literal falsity, this Court conducts a two-part

inquiry:  "(1) whether the challenged advertisement conveys an explicit factual message,

and (2) whether that explicit factual message is false."  When assessing a statement, it

must be viewed in its full context.  Id. at 837.  "Commercial claims that are implicit,

attenuated, or merely suggestive usually cannot be fairly characterized as literally false;"

accordingly, the greater degree to which a commercial message requires the consumer to

integrate its components and draw a conclusion, the less likely it is to support a finding of

literal falsity in advertising.  Surdyk's, 83 F. Supp.2d at 1023 (quotation omitted).

Moreover, a party's statements are not actionable unless the statements are "provably

---

[6] The requirement under the Lanham Act that the defendant must cause its false or misleading statement to enter interstate commerce is not required under Minnesota's misrepresentation statutes.  See Buetow, 713 F. Supp.2d at 837, n. 4.

false." Insignia Systems, Inc. v. News America Marketing In-Store, Inc., 661 F. Supp.2d

1039, 1070 (D. Minn. 2009).

When evaluating whether a statement fits into the second category of literally true

but misleading statements, "proof that the advertising actually conveyed the implied

message and thereby deceived a significant portion of the recipients becomes critical."

United Industries, 140 F.3d at 1182 (quotation omitted).  A plaintiff must put forth expert

testimony or some other evidence to show that a significant number of consumers

actually received the allegedly misleading message from the advertisement and were

thereby deceived.  Transclean Corp. v. Bridgewood Services, Inc., 101 F. Supp.2d 788,

794 (D. Minn. 2000).  Here, none of the statements criticized by Plaintiff in his Amended

Complaint or in his Rule 65(b) motion constitute "literally false" or "true but misleading"

statements on which an actionable misrepresentation claim may be brought.

### A.   Plaintiff's Misrepresentation Claims Fail Because the Statements on Redwood's Website are Not False or Misleading.

#### 1)   EtG/EtS testing is "ideal for zero tolerance and abstinence situations" and "the best and most definitive test available."

Redwood's claims that EtG/EtS testing is "ideal" for zero tolerance and abstinence

situations, as well as "the best and most definitive test available" do not constitute

"literally true, but misleading" statements, but rather amount to nothing but non-

actionable puffery.  See LensCrafters, Inc. v. Vision World, Inc., 943 F. Supp. 1481,

1498 (D. Minn. 1996) (adopting report and recommendation concluding statement that

lens maker used the "most advanced equipment available" was puffery); see also

Evanston Hosp. v. Crane, 254 Ill.App.3d 435, 193 Ill. Dec. 870, 627 N.E.2d 29 (1993)

(holding statements that hospital would provide "high quality" care to patients were expressions of opinion or "puffing"); <u>Porous Media Corp. v. Pall Corp.</u>, 173 F.3d 1109 (8th Cir.1999) (holding statements of product superiority and that product was "industry approved" were puffery); <u>American Italian Pasta Co. v. New World Pasta Co.</u>, 371 F.3d 387, 391 (8th Cir. 2004) (finding that "America's Favorite Pasta" was not a specific, measurable commercial claim that could be reasonably interpreted as an objective fact because the vague terms provided no empirical benchmark).  The caselaw could not be any clearer – expressions of opinion about the quality or superiority of a product such as Redwood's "ideal" and "best and most definitive" statements at issue here do not amount to anything more than puffing.  <u>See</u> <u>id</u>.  These alleged misrepresentations by Redwood are not actionable.

In addition, as described in Mr. Ross' Declaration and in Redwood's marketing materials, Redwood's opinion that the use of EtG/EtS testing in a zero tolerance and abstinence situations is "ideal" is shared within the industry and backed up by science. EtG and EtS tests are performed in most commercial forensic laboratories.  And most courts, probation departments, treatment programs and professional monitoring programs (*e.g.*, pilots and nurses) support the use of EtG/EtS testing in zero tolerance situations. The undisputed fact that the EtG/EtS test can detect these biomarkers after three or four days is a powerful tool for zero tolerance and abstinence situations.

Moreover, using a positive test cut-off of EtG above 100 ng/ml and EtS above 25 ng/ml is, in fact, the "most sensitive and definitive indicator" of recent ethanol ingestion available to monitoring programs.  A test with this type of sensitivity to detect EtG and

EtS biomarkers, which can only be present when ethanol is ingested, is an excellent and necessary starting point to determine the actual sources of a subject's ingestion. This testing, however, is one piece of the puzzle when determining whether a person is drinking alcohol. Accordingly, Redwood explains in its promotional statements that clinical correlation, *i.e.*, a familiarity and understanding of a subject's alcohol consumption and exposure prior to testing, is critical to rendering a diagnosis. *(Plaintiff's TRO Ex. E.)*

### 2) Redwood's EtG/EtS testing produces "highly accurate" results.

Plaintiff claims that Redwood's statement that its EtG/EtS testing provides "highly accurate" results is false and misleading. However, the only evidence in this case shows that this statement by Redwood is defensible and true. There is no dispute that the testing results in Plaintiff's case are accurate. Even the Judge for the probation hearing commented that she was not contesting the validity of the test itself. Nor is there any evidence that others in the public at large have suffered inaccurate test results. Consequently, this statement cannot support a cause of action for consumer fraud, false adverting, or negligence.

Although Plaintiff argues that this statement is false and misleading because the cut-off values do not correlate with proof of drinking, Redwood makes no claim that EtG/EtS testing alone constitutes proof of drinking alcohol. To the contrary, always cognizant of the possibility of incidental exposure, Redwood is careful to phrase all of its EtG/EtS test results in terms of ethanol ***ingestion*** (ethanol entering the body through the mouth, nose or skin) as opposed to consumption (by mouth only). (*Ross Dec.*) Plaintiff's

reliance on the EtG/EtS cut-offs cited on Redwood's website is similarly unavailing because it ignores the fact that the proffered cut-offs are analytical as opposed to diagnostic in nature, as well as the reality that Redwood provides each of its customer with the option to select a higher cut-off if desired.  (*Ross Decl.; see also Plaintiff's Complaint Ex. B.*)  It is up to the customer to use the analytical results as a trigger to seek clinical confirmation as they see fit – a secondary step that Redwood, in fact, encourages of its customers on its website.

3) **Analytical methods, as they relate to the EtG/EtS test, "are approved by the U.S. Department of Health and Human Services" and utilize the "most sophisticated, sensitive, and specific equipment and technology available."**

Redwood's statements that the analytical methods it uses are approved by HHS and utilize "the most sophisticated, sensitive, and specific equipment and technology available, LC/MS/MS" do not constitute misrepresentations because they are true.  The actual "approval" statement on Redwood's website provides that "[t]he analytical methods used by RTL are scientifically accepted and approved by the U.S. Department of Health and Human Services."  *(Plaintiff's Complaint Ex. B.)*    If Plaintiff were to have explored Redwood's website further (or less selectively), he would have discovered the fact that Redwood maintains a Certificate of Compliance with HHS, and therefore undergoes on-site inspections and proficiency testing once every two years – a compliance review process that includes inspection and approval of Redwood's specific procedures, documentation, and personnel.  *(Ross Decl.; see also Redwood Ex. 1, 2.)*  Included among the procedures reviewed by HHS is the LC/MS/MS method used by

23

Redwood to screen, confirm, and quantify the presence of EtG/EtS.  This LC/MS/MS method is also approved of by the CLIA-88, 42 C.F.R. § 493 *et seq*.  *(Ross Decl.)*

Plaintiff suggests that EtG/EtS testing is invalid based on an Advisory Opinion in a 2006 SAMHSA publication.  However, SAMHSA has no jurisdiction or authority over Redwood.  (*Ross Decl*.)  Moreover, a disclaimer at the end of this Advisory Opinion indicates that the views expressed in the opinion do *not* reflect the views of SAMHSA or HHS.  *(Plaintiff's Complaint Ex. D; Plaintiff's TRO Ex. H.)*  In sum, the statement from Redwood is true and not actionable.

### 4)  Are They Drinking?  We'll Find Out.

Redwood's tagline – "Are They Drinking?  We'll Find Out." – does not constitute a false or misleading statement.  A mere commercial tagline of no real substantive value or factual import, cannot form the basis of an actionable misrepresentation claim.  Indeed, the determination of whether or not an individual is drinking is a combination of analytical and diagnostic determinations that, taken together, can lead to certain opinions and conclusions.  Only when combined with clinical correlation by the customer may Redwood's analytical test results lead to a diagnosis that a subject is drinking alcohol.

To be actionable, a factual statement must be "specific and measurable . . . capable of being proved false or of being reasonably interpreted as a statement of objective fact." American Italian Pasta Co., 371 F.3d at 391 (quotation omitted).  This vague, non-substantive tagline statement cannot reasonably be interpreted as a statement of objective fact capable of being proven true or false in and of itself, and therefore constitutes puffery

that cannot form the basis of Plaintiff's misrepresentation claims against Redwood.  See

United Industries, 140 F.3d at 1183 (puffery not actionable).

### 5) "Legal, Defensible Results."

Redwood's statement that EtG/EtS testing provides "legal, defensible results" is

not false or misleading.  Rather, this statement of legal defensibility is true and supported

by the fact that courts throughout the country have upheld EtG/EtS testing results as a

scientifically-established and reliable method of testing, and thus have repeatedly allowed

Redwood to testify regarding these topics.  (*Ross Decl.*)  The testing done by Redwood

has never been excluded from admissibility.  *Id.*  As noted above, neither Plaintiff nor

anybody else in this case – from the judge in the probation hearing to Plaintiff's expert –

questions the accuracy of the testing results.  Accordingly, this statement cannot support

Plaintiff's claim.

### B.  Plaintiff's Misrepresentation Claims Fail Because There is No Causal Nexus Between the Challenged Statements and Plaintiff's Claimed Damages.

In addition to lacking proof of any actionable false and misleading statements by

Redwood, Plaintiff's misrepresentation claims cannot stand because there is no causal

nexus between Redwood's alleged misrepresentations and Plaintiff's claimed damages.

Again, prevailing on a misrepresentation claim requires proof "that the plaintiff has been

or likely to be injured as a result of the false statement."  Surdyk's Liquor, 83 F. Supp.2d

at 1022; see also Group Health Plan, 344 F.3d at 756-57; Buetow, 713 F. Supp. at 837.

Although Minnesota's statutory misrepresentation claims do not require a strict showing

of direct causation, "plaintiffs must still 'prove a causal nexus between the allegedly

wrongful conduct of the defendants and their damages.'" In re St. Jude Medical, Inc.,

522 F.3d at 839 (quoting Group Health Plan, 621 N.W.2d at 13-14 (noting that "where, as

here, the plaintiffs allege that their damages were caused by deceptive, misleading, or

fraudulent statements or conduct in violation of the misrepresentation in sales laws, as a

practical matter it is not possible that the damages could be caused by a violation without

reliance on the statements or conduct alleged to violate the statutes.")); see also Tuttle v.

Lorillard Tobacco Co., 377 F.3d 917, 927 (8th Cir. 2004) (opining that a plaintiff must

establish some proof that the defendant's conduct caused consumers to continue their use

of smokeless tobacco and to suffer injuries as a result of their reliance on defendant's

conduct).

      Here, Redwood simply provides a service and conveys test results to its customers.

(*Ross Decl.*)  A urine sample was sent to Redwood and tested per Tri-County's

specifications, and Redwood then sent Tri-County results for the subject sample.

Redwood had no input in deciding whether Plaintiff violated parole or should be

incarcerated.  And despite the heightened pleading requirements of Fed. R. Civ. P. 9(b),

Plaintiff has not pled the who, what, when, where, or how of Redwood's alleged

misrepresentations to Tri-County.  Plaintiff has not alleged or shown that these alleged

misrepresentations were published by Redwood at the time that Tri-County entered into

an agreement with Redwood to perform EtS/EtG testing for its zero-tolerance probation

program, nor has he demonstrated that anyone from the County ever reviewed, let alone

relied upon, these challenged statements in whole or in part.  Furthermore, there is no

evidence that any of Redwood's statements are causally related to the probation officer's

decision to incarcerate plaintiff or Tri-County's initial decision to enter into a service

agreement with Redwood, and no amount of discovery will eliminate this deficiency in

Plaintiff's claims.  Indeed, as noted by this Court in its May 25 Order denying Plaintiff's

request for injunctive relief

> Even if Miller's test result was the sole cause of his detention, the record
> before the Court does not show that it was Redwood, as opposed to a
> probation officer, the state court, or even Miller himself, that either caused
> the initial detention or caused the detention to continue for 135 days.

*(Docket No. 24, TRO Order.)*  Because no evidence of causation is alleged or

present here, Plaintiff's misrepresentation claims necessarily fail.  These claims

will not get any better with discovery.

### D. Plaintiff's Misrepresentation Claims Fail Due to Lack of Standing under Minnesota's Private Attorney General Statute.

In addition to Plaintiff's inability to establish the prima facie elements of his

misrepresentation claims, Plaintiff lacks standing to avail himself of the Minnesota False

Advertising law and Consumer Fraud Act under which he brings this lawsuit.  In order

for a private citizen to pursue either of these misrepresentation claims, they must due so

pursuant to Minnesota's private attorney general statute.  See Minn. Stat. § 8.31, subd.

3a.  Significantly, however, an individual can only bring a private attorney general action

upon showing that pursuit of their claims will **benefit the public at large**.  See Ly v.

Nystrom, 615 N.W.2d 302, 314 (Minn. 2000) (advising that a private attorney general

action under Minn. Stat. § 8.31, subd. 3a may only be brought if it benefits the public);

Davis v. U.S. Bancorp, 383 F.3d 761, 767-68 (8th Cir. 2004) (finding plaintiff could not

establish prudential standing under Minnesota's private attorney general statute because

she failed to demonstrate that her causes of action would benefit the public at large). Plaintiff cannot allege that he is seeking to benefit the public at large.

First and foremost, Redwood merely reported accurate test results, and then Tri-County alone decided what to do with those test results. This has nothing to do with the public at large.

Second, Plaintiff's allegations relate solely to his own experience with Redwood's EtG/EtS test, and provide no proof that his experience with the test – including alleged incidental exposure and resulting probation violation, incarceration – was shared by any other "consumer." To hold that Plaintiff's allegations regarding his personal, fact-specific, and highly individualized experience are sufficient to establish a benefit to the public at large would render the class of plaintiffs under Minnesota's private attorney general statute "limitless." Davis, 383 F.3d at 768. Moreover, Plaintiff has failed to put forth any evidence that Tri-County or any other consumers actually relied upon and were deceived by Redwood's alleged misrepresentations. Although Plaintiff hypothesizes that Redwood's statements are the only plausible explanation for Plaintiff's experience, such supposition and conjecture – without any effort to rule out the numerous other explanations (such as failure of probation officer to follow procedure, failure of Tri-County to adopt a confirmatory procedure, economic pressure on Tri-County, the possibility that additional factors contributed to Tri-County's probation violation decision, etc.) cannot support prudential standing. Put simply, Plaintiff's misrepresentation claims necessarily fail for lack of standing because Plaintiff cannot show how his pursuit of these claims against Redwood would benefit the public at large.

In sum, Plaintiff cannot establish false or misleading statements by Redwood, has no allegations (let alone evidence) to establish a causal nexus between those statements and his claimed injuries, and has no standing to bring his claims under Minnesota's misrepresentation statutes.  Accordingly, Plaintiff's false advertising and consumer fraud claims must be dismissed.

## II.   **Plaintiff's Negligence Claim Necessarily Fails.**

Plaintiff also asserts a common law negligence claim against Redwood, alleging that Redwood failed to provide him with reliable test results and failed to warn him of the test's "known false positive rate." *(Docket No. 5, Amended Complaint at ¶ 31-34.)*  But Plaintiff cannot establish a prima facie claim of negligence.

To establish a claim of negligence, a plaintiff must show:  (1) duty; (2) breach of that duty; (3) that the breach is the proximate cause of plaintiff's claimed damages; and (4) damages.  Johnson v. State, 553 N.W.2d 40, 49 (Minn. 1996).  Critically, Plaintiff here cannot show that Redwood owed him any duty.  See, e.g., Kuhl v. Heinen, 672 N.W.2d 590, 594 (Minn. App. 2003) (finding no actionable claim of negligence absent proof of duty).  Although Plaintiff claims that Redwood owed him a duty to avoid erroneous test results, a duty of care is created by contract, a fiduciary relationship, or applicable statute – none of which exist here between Redwood and Plaintiff.  See ServiceMaster of St. Cloud v. GAB Business Services, Inc., 544 N.W.2d 302, 307 (Minn. 1996).  Additionally, Plaintiff has no allegations – let alone evidence – to establish the requisite element of breach.  Although Plaintiff makes the bald and conclusory allegation that Redwood negligently provided him with a "less than reliable" indicator of alcohol

29

consumption, Redwood does not advertise or otherwise purport to provide its customers with proof of whether alcohol consumption has occurred. (*Docket No. 5, Amended Complaint.*) Rather, Redwood is careful to only offer opinions on whether its test results are consistent or inconsistent with the ingestion (not consumption) of ethanol (not alcohol). *(Ross Decl.)* Similarly, Plaintiff's assertion that Redwood negligently failed to warn of the potential for false positives as a result of its EtG/EtS test is belied by the warnings of incidental exposure on Redwood's website and in its promotional materials. *(Docket No. 5, Amended Complaint; Plaintiff's TRO Ex. E.)* Finally, Plaintiff's negligence claim cannot survive absent proof of a causal nexus between Redwood's allegedly negligent conduct and Plaintiff's claimed damages – of which Plaintiff here has none. As discussed previously in regard to Plaintiff's misrepresentation claims, Redwood simply provides a service and conveys test results to its customers, reporting "presumptively positive" findings above the EtG/EtS cut-offs **selected by its customers**, not Redwood. Redwood had no input in deciding whether or not Plaintiff violated parole, nor is there any evidence that Plaintiff's probation officer or anyone else at Tri-County relied on any of the challenged statements in deciding to incarcerate Plaintiff or in making the initial decision to enter into a service agreement with Redwood. For all these reasons, Plaintiff's negligence claim cannot stand.

### III.   **Plaintiff's Class Allegations are Not Justified in Law or in Fact.**

In addition to his individual claims, Plaintiff seeks to represent a class under Fed. R. Civ. P. 23. But Plaintiff's overly generalized and conclusory allegations regarding the prerequisites for class certification fall flat.

As discussed in <u>Twombly</u>, in order to survive a motion to dismiss, a pleading must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 127 S. Ct. at 1964-65; <u>see also</u> <u>Peterson</u>, 2007 WL 1725355, *1. As aptly put by at least one court, "[t]he need for discovery to complete the factual basis for alleged claims is not an excuse to allege claims with no factual basis." <u>See</u> <u>In re Knustler</u>, 914 f.2d 505, 516 (4th Cir. 1990); <u>see also Twombly</u>, 127 S. Ct. at 1968 (noting that a complaint cannot simply "le[ave] open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery."). This same level of specificity is required of both individual and class/collective claims. <u>See, e.g.,</u> <u>Czech v. Wall Street on Demand, Inc.,</u> 674 F. Supp.2d 1102, 1115-18 (D. Minn. 2009).

In this case, the class allegations set forth in Plaintiff's Amended Complaint lack the necessary "heft" to nudge Plaintiff's class claims "across the line from conceivable to plausible." <u>Twombly</u>, 127 S. Ct. at 1974. Plaintiff has not and cannot establish the numerosity of the class he purports to represent. Why? Because he is truly a class of one. Lacking evidence of numerosity, Plaintiff makes the naked assertion that "[g]iven that Redwood has performed this test millions of times, the potential class members are innumerable, but upon information and belief, in excess of 1,000 members." Significantly, Plaintiff fails to explain or support this proposed correlation between the number of times the EtG/EtS test has been administered by Redwood and the number of potential class members he purports to represent. Nor can he show why joinder of these "innumerable" class members would be impractical. And although Plaintiff alleges that he is "typical of the proposed class members in that they share common questions of law

31

and fact," and would "adequately protect the interest of all members," he provides no factual allegations to provide substance to his formulaic recitation of these elements. Indeed, Plaintiff has no personal knowledge of the who, what, when, where, or how of his own misrepresentation claims, let alone those of the other individuals that allegedly relied on Redwood's challenged statements to their detriment.  Moreover, Plaintiff has not alleged and cannot allege facts sufficient to satisfy the predominance requirement of Rule 23(b)(3).  See also Alguilar v. Allstate Fire & Cas. Ins. Co., 2007 WL 734809, *2-3 (E.D. La. March 6, 2007).  Even assuming that Plaintiff can satisfy the other Rule 23 certification requirements (which Redwood vehemently denies), the individualized and highly personal issues pertaining to each potential class member – including but not limited to:  (1) the purpose for which the test was used by each administering entity; (2) the different terms of agreement between each administering entity and Redwood, including each entity's self-selected EtG/EtS cut-off levels; (3) what Redwood representations were allegedly relied on by each administering entity to its detriment; (4) when and how these representations were allegedly made; (5) the clinical history of the testing subject; (6) the levels of EtG/EtS results obtained by Redwood; (7) the weight attached to the test results by each administering entity or associated court system; and (8) the adverse consequences allegedly suffered by each subject – predominate over the alleged common questions (not even articulated in Plaintiff's Amended Complaint, ¶ 23) and render Plaintiff's claims inappropriate for class treatment.

## CONCLUSION

Plaintiff's Amended Complaint fails to state a claim on both his individual and class-based misrepresentation and negligence claims against Redwood.  Accordingly, Redwood respectfully requests that this Court dismiss the Amended Complaint in its entirety.

Respectfully submitted,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P. C.

Dated:  June 10, 2011

s/Hal A. Shillingstad
Hal A. Shillingstad, #195777
Ashley A. Wenger, #0388340
Wells Fargo Center
90 South Seventh Street, Suite 3800
Minneapolis, MN  55402
Telephone:  612.339.1818
Fax:  612.339.0061
Email:
hal.shillingstad@ogletreedeakins.com