# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

John G. Miller,                                    Civil No. 11-115 (DWF/LIB)
on behalf of himself and all others
similarly situated,

                    Plaintiff,

v.                                                      **MEMORANDUM**
                                              **OPINION AND ORDER**

Redwood Toxicology Laboratory, Inc.,

                    Defendant.

_____

A. L. Brown, Esq., The Law Offices of A. L. Brown; Andrew L. Davick, Esq., and
Anthony J. Nemo, Esq., Meshbesher & Spence, Ltd.; and Joshua R. Williams, Esq., The
Law Office of Joshua R. Williams, PLLC, counsel for Plaintiff.

Hal A. Shillingstad, Esq., Andrea D. Kiehl, Esq., and Ashley A. Wenger, Esq., Ogletree,
Deakins, Nash, Smoak & Stewart, P.C., counsel for Defendant.

_____

# INTRODUCTION

This matter is before the Court on a Motion to Dismiss or alternatively for

Summary Judgment brought by Defendant Redwood Toxicology Laboratory, Inc.

("Redwood").  For the reasons set forth below, the Court grants Redwood's motion to

dismiss.

# BACKGROUND

The facts of this case are set forth in this Court's May 25, 2011 Order denying

Plaintiff John G. Miller's Motion for a Temporary Restraining Order, Preliminary

Injunction, [and] Expedited Discovery.  (Doc. No. 24.)  Redwood relies on the same

affidavits, declarations, and exhibits that are either attachments to Miller's original

Complaint or were filed in support of or in opposition to Miller's motion for preliminary

injunctive relief.[1]  The Court briefly restates and, where necessary, supplements the facts

below.

      Redwood is in the business of operating forensic drug testing facilities.  Redwood

performs numerous toxicological drug and alcohol tests, including EtG/EtS urine tests at

the request of customers nationwide.  (Doc. No. 20, Ross Decl. ¶ 2.)  Redwood's

scientific procedures, documentation, and personnel are licensed by the U.S. Department

of Health and Human Services ("DHHS").  (*Id.* ¶ 7, Ex. 1.)

      EtG/EtS testing involves the measurement of EtG (ethyl glucuronide) and EtS

(ethyl sulfate), two direct metabolites from ethanol that can be found in urine up to three

to four days after ethanol is ingested.  (*Id.* ¶ 3.)  Ethanol is a chemical compound found in

various products, including fermented alcohol products such as beer, wine, and distilled

liquors.  (*Id.* ¶ 4.)  Ingestion refers to the presence of the ethanol compound in the body

from any means or source whether oral, inhaled, or dermal, whereas consumption refers

more exclusively to oral consumption or drinking.  (*Id.* ¶ 5.)  The only way a test subject

can have EtG or EtS in the urine is if ethanol has been ingested.  (*Id.* ¶ 16.)  An EtG level

---

[1]     The Court's consideration of these materials does not require the Court to convert
the motion to dismiss into a motion for summary judgment because the materials
considered are part of the public record, are necessarily embraced by the pleadings, or do
not contradict the complaint.  *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077,
1079 (8th Cir. 1999).  *See also* 5A Charles A. Wright & Arthur R. Miller, *Federal
Practice and Procedure*: Civil 3d § 1357.

over 100 ng/mL and EtS level over 25 ng/mL indicate exposure to ethanol but is not

dispositive of intentional consumption of alcohol.  (*Id.* ¶ 17.)

Redwood's customers include those who employ zero tolerance and abstinence

programs.  (*Id*. ¶ 13.)  Redwood's customers specify the EtG and EtS cut-off levels they

want for positive findings.  (*Id*. ¶ 15.)  Tri-County Community Corrections

("Tri-County") is a customer of Redwood's.  (*Id*.)  Tri-County selected a cut-off of EtG

above 100 ng/ml and EtS above 25 ng/ml as a positive finding of recent ethanol

ingestion.  (*Id*.)

Redwood does not offer a definitive opinion on alcohol consumption and states:

> **How accurate and reliable is the EtG/EtS test?**
> EtG/EtS are direct metabolites of alcohol (ethanol), and their detection in
> urine is highly specific, similar to testing for other drugs . . . .
> This methodology provides highly accurate results.  As is the case with any
> laboratory test, it is also very important to obtain clinical correlation.

(Doc. No. 15, Williams Decl. ¶ 3, Ex. E at 2.)  Clinical correlation means "knowledge of

a test subject's medical history, alcohol consumption history and/or abuse, DUI

convictions and/or alcohol related convictions and other indicators of alcohol abuse."

(Ross Decl. ¶ 20.)

Incidental exposure to alcohol can also result in EtG concentrations in excess of

100 ng/ml, a possibility that is discussed in Redwood's materials:

> **Will the use of incidental alcohol, such as mouthwash and**
> **Over-the-Counter (OTC) cough syrups trigger a positive result?**
> Tests show that "incidental exposure" to the chronic use of food products
> (vanilla extract), hygiene products, mouthwash, or OTC medications
> (cough syrups), which contain ethanol, can produce EtG concentrations in
> excess of 100 ng/mL.  However, if measurable ethanol is detected
> (>.04 gm %) in the urine, and EtG is detected in excess of 100 ng/mL and

3

EtS is also detected in excess of 25 ng/mL, then this is very strong evidence that beverage alcohol was ingested.

Most alcohol abstinence programs require an agreement to avoid all products containing alcohol, including; mouthwash, Nyquil®, OTC medications, etc.  Consumption of these products could produce a positive test for alcohol and/or EtG/EtS and would thus violate the agreement.

(Williams Decl. ¶ 3, Ex. E at 2.)

Miller is a recovering alcoholic.  (Doc. No. 17, Miller Aff. ¶ 1; Doc. No. 5, Am. Compl. ¶ 10.)  In January 2008, he was placed on supervised probation until January 2015.  (Miller Aff. ¶ 2; Am. Compl. ¶ 11.)  One of the conditions of his probation is that Miller may not use or possess alcohol, and he is therefore subject to random alcohol testing.  (*Id.*)  On or around March 6, 2010, Miller suffered a relapse which led to the filing of a probation violation.  (Miller Aff. ¶ 3.)  Miller initially denied, but later admitted, the March 6 violation.  (Williams Decl. ¶ 4, Ex. F at ¶ 3.)  Miller's probation was reinstated on May 10, 2010.  (*Id.*)

On June 15, 2010, Miller's probation agent required him to submit a urine sample.  (Miller Aff. ¶ 6; Am. Compl. ¶ 13.)  That sample was sent to Redwood for testing, and Redwood reported that the sample was positive for EtG with a level of 1130 ng/mL and positive for EtS with a level of 603 ng/mL.  (Miller Aff. ¶ 7.)  Miller denies that he drank any alcohol.  A probation violation was filed against Miller, and he was arrested on or about June 23, 2010.  (*Id.* ¶¶ 7, 9; Am. Compl. ¶ 18.)  Miller's probation violation hearing was originally scheduled for July 26, 2010, but was twice continued and ultimately occurred on September 29, 2010.  (Miller Aff. ¶¶ 12-14.)

At the hearing, Miller testified that in the days before he provided his urine sample, he assisted his mother in closing up a gift shop by cleaning metal shelving with a lacquer thinner which contained an alcohol substance.  (Williams Decl. ¶ 4, Ex. F at ¶ 5.) Miller testified that there were heavy fumes from the thinner and no ventilation in the room.  (*Id.*)  Miller also testified that on or about June 13, 2010, his father went to the emergency room with a broken hip, and that between June 13 and June 15 Miller used hand sanitizer containing an alcohol substance at the hospital several times.  (*Id.*)

The State of Minnesota called John Martin to testify at the probation violation hearing.  Martin is a toxicologist and a technical consultant and certifying scientist at Redwood.  (*Id.* ¶ 2, Ex. A at 3.)  Martin testified that "there is considerable discussion concerning what is a good cut-off and whether there truly is one that could absolutely delineate between exposure to secondary products and exposure to only ethanol."  (*Id.* at 21.)  When asked if he was "aware of any scientific literature or papers regarding EtG or EtS testing which indicate that the incidental use in and of itself can result in EtG levels in excess of a thousand nanograms per milliliter," Martin testified that "as far as those articles that have been reviewed, the highest levels that I've seen indicated are one was 713."  (*Id.* at 15.)

Miller called Dr. Gregory Skipper to testify at the probation violation hearing. (Williams Decl. ¶ 5, Ex. G at 3.)  Dr. Skipper uses EtG/EtS testing as a tool to ensure compliance for doctors in the Alabama Physician Health program.  (*Id.* at 3, 8-9.)  Dr. Skipper testified that in his opinion there was no agreed upon or known cut-off level for EtG levels to indicate that somebody has been drinking.  (*Id.* at 19.)  He testified that a

5

study that involved using hand gel every two minutes for an hour in a closed room resulted in levels up to nearly 800 ng/mL, that a pharmacist using hand gel every half hour throughout the day produced a result of 770, and that a doctor "that fairly certainly had only used topical alcohol on joints" had a level of 1500.  (*Id.* at 16, 20.)

When a subject in the Alabama Physician Health program directed by Dr. Skipper has a positive EtG/EtS test and denies drinking, a second test, called phosphatidyl ethanol, is performed to confirm drinking.  (*Id.* at 9.)  Dr. Skipper testified that about ten or fifteen percent of positive EtG/EtS tests have a negative result on the phosphatidyl ethanol test.  (*Id.* at 10.)  Dr. Skipper also testified that the phosphatidyl ethanol test only produces a positive result if a person has consumed about seven standard drinks within a week.  (*Id.* at 24-25.)

The state court found that Miller had credibly presented evidence of incidental exposure to alcohol and the State of Minnesota had not met its burden of proving that Miller had violated his probation by clear and convincing evidence.

On January 18, 2011, Miller filed a lawsuit against Redwood.  (Doc. No. 1.) Miller later amended his complaint to allege a proposed class action.  (Doc. No. 5.)  The First Amended Complaint asserts three causes of action:  violation of Minnesota False Statement in Advertising Act ("FSAA"), Minn. Stat. § 325F.67; violation of Minnesota Consumer Fraud Act ("CFA"), Minn. Stat. § 325F.69; and negligence.

On April 20, 2011, Redwood filed a motion to dismiss.  (Doc. No. 11.)  On April 25, 2011, Miller filed a Motion for Temporary Restraining Order, Preliminary Injunction, [and] Expedited Discovery.  (Doc. No. 13.)  By Order dated May 25, 2011,

the Court denied the latter motion.  (Doc. No. 24.)  The Court now considers Redwood's

motion to dismiss.

## DISCUSSION

### I. Legal Standard

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court assumes all

facts in the complaint to be true and construes all reasonable inferences from those facts

in the light most favorable to the complainant.  *Morton v. Becker*, 793 F.2d 185, 187 (8th

Cir. 1986).  In doing so, however, a court need not accept as true wholly conclusory

allegations, *Hanten v. School District of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir.

1999), or legal conclusions drawn by the pleader from the facts alleged.  *Westcott v. City

of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  A court may consider the complaint,

matters of public record, orders, materials embraced by the complaint, and exhibits

attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6).  *Porous

Media Corp. v. Pall Corp.*, 186 F.3d at 1079.

To survive a motion to dismiss, a complaint must contain "enough facts to state a

claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

547 (2007).  Although a complaint need not contain "detailed factual allegations," it must

contain facts with enough specificity "to raise a right to relief above the speculative

level."  *Id.* at 555.  As the United States Supreme Court recently reiterated, "[t]hreadbare

recitals of the elements of a cause of action, supported by mere conclusory statements,"

will not pass muster under *Twombly*.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)

(citing *Twombly*, 550 U.S. at 555).  In sum, this standard "calls for enough fact[s] to raise

a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

## II.     Consumer Fraud and False Statement in Advertising Claims

In his First Amended Complaint, Miller alleges claims under the CFA and the FSAA.  In particular, Miller alleges that Redwood's website and other advertising materials misrepresent the accuracy of the EtG/EtS test, the appropriate application of the EtG/EtS test in a zero tolerance program, the approval of governmental agencies for its methodology in the application of EtG/EtS testing, and that the presence of EtG in excess of 100 ng/ML is the "most definitive" indicator of alcohol consumption.  (Am. Compl. ¶¶ 26, 29.)

Redwood moves to dismiss these two claims, arguing that they are legally and factually unsupportable.  Redwood contends that Miller's misrepresentation claims fail because:  (1) the statements at issue are factually accurate and/or mere puffery; (2) there is no allegation that Miller was "damaged thereby"; and (3) Miller cannot establish that his pursuit of these misrepresentation claims would benefit the public at large.[2]

---

[2]     The parties disagree as to whether the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies to Miller's misrepresentation claims.  The Court need not decide the issue because the Court concludes that Miller's claims fail regardless of the pleading standard applied.

The CFA provides, in relevant part, as follows:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

Minn. Stat. § 325F.69.  The FSAA provides, in relevant part, as follows:

> Any person, firm, corporation, or association who . . . makes, publishes, disseminates, circulates, or places before the public, or causes, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public . . . an advertisement of any sort . . . which advertisement contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading, shall, whether or not pecuniary or other specific damage to any person occurs as a direct result thereof, be guilty of a misdemeanor, and any such act is declared to be a public nuisance and may be enjoined as such.

Minn. Stat. § 325F.67.

The appropriate analysis for Miller's statutory misrepresentation claims is the same as that applied under the Lanham Act.  *See Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 757 (8th Cir. 2003); *Buetow v. A.L.S. Enters., Inc.*, 713 F. Supp. 2d 832, 837 (D. Minn. 2010).[3]  To prevail on a false-advertising claim under the Lanham Act, a plaintiff must prove:

> (1) that defendant made a false statement of fact in a commercial advertisement about its own or another's product; (2) that the statement actually deceived or would tend to deceive a substantial segment of its audience; (3) that the deception is material, in that it is likely to influence the purchasing decision; (4) that defendant caused its false statement to

---

[3]     Miller asserts that the Court should not rely on the Lanham Act in assessing his statutory misrepresentation claims, but does not otherwise offer any authority disputing the case law that provides otherwise.

enter interstate commerce; and (5) that the plaintiff has been or likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant or by a loss of good will associated with its products.

*Buetow*, 713 F. Supp. 2d at 837 (citing *Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc*., 83 F. Supp. 2d 1016, 1022 (D. Minn. 2000)).[4]

Under the Lanham Act, there are two categories of actionable false statements: "(1) commercial claims that are literally false as a factual matter, and (2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Surdyk's Liquor*, 83 F. Supp. 2d at 1022 (citation omitted). When considering an alleged literal falsity, the court conducts a two-part inquiry: "(1) whether the challenged advertisement conveys an explicit factual message, and (2) whether that explicit factual message is false." *Id*. During such an inquiry, the Court views the advertisements in their full context. *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1180-81 (8th Cir. 1998). In determining whether an advertisement is not literally false but misleading, the Court assesses whether "the advertising actually conveyed [an] implied message and thereby deceived a significant portion of the recipients." *Id*. at 1182.

Miller alleges that the following statements on Redwood's website and other promotional materials are untrue: (1) that Redwood's test uses the "most sophisticated, sensitive and specific equipment and technology available"; (2) that the EtG/EtS test was "ideal for zero tolerance and abstinence situations"; (3) that the test could produce

---

[4]    The interstate commerce requirement under the Lanham Act is not required under the Minnesota statutes relevant here. *Buetow*, 713 F. Supp. 2d at 837, n.4.

"highly accurate results for up to 80 hours after ingestion"; (4) that Redwood's analytical methods "are accepted and approved by the U.S. Department of Health and Human Services"; and (5) that  EtG "is only detected in urine when ethanol has been ingested" and that any EtG level over 100 ng/mL is the "most definitive" indicator that the specimen came from a person who has ingested alcohol.  (Am. Compl. ¶¶ 5-8.)

As explained in the May 25, 2011 Order denying Miller's motion for preliminary injunction, at the core of Miller's CFA and FSAA claims is the argument that Redwood misleads the public into believing that its EtG/EtS test, with cut-off levels of 100 ng/mL of EtG and 25 ng/mL of EtS, is dispositive as to intentional consumption of beverage alcohol.  The Court notes again, however, that Redwood's materials, which are relied upon by Miller, explain the importance of obtaining clinical correlation to a positive test and recognize the potential that incidental exposure to products containing ethanol could trigger a positive test result.  For example, Redwood's materials include the following under "Frequently Asked Questions":

> **How accurate and reliable is the EtG/EtS test?**
> EtG/EtS are direct metabolites of alcohol (ethanol), and their detection in urine is highly specific, similar to testing for other drugs . . . .
> This methodology provides highly accurate results.  As is the case with any laboratory test, it is also very important to obtain clinical correlation.
>
> . . . .
>
> **Will the use of incidental alcohol, such as mouthwash and Over-the-Counter (OTC) cough syrups trigger a positive result?**
> Tests show that "incidental exposure" to the chronic use of food products (vanilla extract), hygiene products, mouthwash, or OTC medications (cough syrups), which contain ethanol, can produce EtG concentrations in excess of 100 ng/mL.  However, if measurable ethanol is detected (>.04 gm %) in the urine, and EtG is detected in excess of 100 ng/mL and

> EtS is also detected in excess of 25 ng/mL, then this is very strong evidence
> that beverage alcohol was ingested.

(Williams Decl. ¶ 3, Ex. E at 2.)  Redwood's website also contains a copy of its current

Certificate of Compliance issued by the Centers for Medicare & Medicaid Services

within DHHS.  (Ross Decl. ¶ 7, Ex. 1.)

The Court first considers Miller's assertion that Redwood's claims that its EtG/EtS

testing is "ideal" for zero tolerance and abstinence situations and is "the best and most

definitive test available" are false and misleading.  Upon review, these statements are

simply expressions of opinion about the quality or superiority of Redwood's EtG/EtS

test.  Generalized statements of product superiority that are expressed in broad, vague,

and commendatory language are puffery and are not actionable under the Lanham Act or

related state statutes.  *See LensCrafters, Inc. v. Vision World, Inc.*, 943 F. Supp. 1481,

1489 (D. Minn. 1996).  Accordingly, these two statements do not support Miller's CFA

or FSAA claims.

Second, the Court concludes that Redwood's representation that its EtG/EtS

testing produces "highly accurate" results cannot support Miller's misrepresentation

claims.  Miller argues that this statement is false and misleading because the cut-off

values do not correlate with proof of drinking alcohol.  However, the materials cited by

Miller do not show that Redwood ever claimed that its test alone provided proof of

*drinking alcohol*.  Instead, Redwood represents that its test is accurate in determining

*ethanol ingestion*, cautions that it is "very important to obtain clinical correlation," and

explains the possibility of "incidental exposure" producing EtG concentrations in excess

of 100ng/mL.[5]  Therefore, the Court concludes Miller has failed to cite to any facts that would show that Redwood's representation that its EtG/EtS testing produces "highly accurate" results is false or misleading.

Third, Miller takes issue with Redwood's representation that the EtG/EtS test is "approved by the U.S. Department of Health and Human Services" and utilizes the "most sophisticated, sensitive, and specific equipment and technology available."  Redwood's website provides:

> The following is an explanation of [Redwood's] urine screening and confirmation procedures/cut-off levels.  The routine cut-off levels listed below may periodically change.  Note: some cut-off levels may differ for your agency.  The analytical methods used by [Redwood] are scientifically accepted and approved by the U.S. Department of Health and Human Services.

---

[5]   Indeed, in its materials, Redwood explains:

**Why do EtG cut-off values vary at different labs?**
Various cut-off levels (100, 250, 500, or 1000 ng/mL) are suggested for use in EtG testing.  Any EtG level over 100 ng/mL and EtS level over 25 ng/mL indicates exposure to ethanol.  In order to provide alcohol abstinence programs with the most clinically relevant answer to whether or not recent ethanol ingestion has occurred, using a 100 ng/mL cut-off for EtG and a 25 ng/mL cut-off for EtS detection is the best and most definitive test available to answer his question . . . .

**What does a positive EtG test above 100 ng/mL and an EtS above 25 ng/mL mean?**
A positive EtG test above 100 ng/mL and EtS above 25 ng/ML indicates recent ethanol ingestion.  The only way you can have EtG/EtS in the urine is if ethanol is in your body.  In addition, using a 100/25 ng/mL cut-off nearly doubles the time of detection of recent ethanol detection versus the use of a 250 ng/mL cut-off.  In summary, the 100/25 ng/mL EtG/EtS cut-off is superior for monitoring purposes, and provides the most sensitive and definitive indicator of recent ethanol ingestion.

(Williams Decl. ¶ 3, Ex. E at 2.)

(Williams Decl. ¶ 3, Ex. C.)  Indeed, the Department of Health and Human Services

licenses Redwood's scientific procedures, documentation and personnel every two years.

(Ross Decl. ¶ 7, Ex. 1.)  In addition, Redwood's website contains a section entitled

"Certifications & Licenses" wherein Redwood lists its various licenses and

accreditations, including its Certificate of Compliance by the Federal Department of

Health and Human Services.  (*Id*. ¶ 9, Ex. 2.)  Miller has failed to cite to any facts that

would show that Redwood's representation that its EtG/EtS test is "approved by the U.S.

Department of Health and Human Services" is false and misleading.  Nor has Miller

provided any facts to support its conclusory allegation that Redwood's claim that it uses

the "most sophisticated, sensitive, and specific equipment and technology available" is

false and misleading.

For all of the above reasons, the Court concludes that Miller has failed to plead

facts that would establish that Redwood engaged in conduct prohibited by the CFA or

FSAA.  Accordingly, those two claims are properly dismissed.[6]

## III.    Negligence

Miller also asserts a claim for negligence.  Under Minnesota law, there are four

elements to a negligence claim:  (1) duty; (2) breach; (3) that the breach proximately

---

[6]      Redwood also asserts that even if its representations could be construed as untrue,
Miller's CFA and FSAA claims still fail because Miller has not adequately alleged the
element of causation or that his claims benefit the public at large under the Private
Attorney General Statute, Minn. Stat. § 8.31.  Because the Court has already determined
that Miller's CFA and FSAA claims cannot survive the present motion to dismiss, the
Court need not reach these additional arguments.

caused plaintiff's claimed damages; and (4) damages.  *See Louis v. Louis*, 636 N.W.2d 314, 318 (Minn. 2001).

In his Amended Complaint, Miller alleges that Redwood owed him a duty to provide him test results that were reliable indicators of whether he had consumed alcohol and to warn Miller of its known false positive rate.  In determining whether a duty exists, the Court considers (1) the relationship of the parties, and (2) the foreseeability of the risk involved.  *Gilbertson v. Leininger*, 599 N.W.2d 127, 130 (Minn. 1999).  Miller asserts that Redwood owes a duty to those whose specimens they test.  In particular, Miller points out that he paid for the test, was required to take the test as a condition of his freedom, and that Redwood "assumed the duty of being the only objective voice" on whether Miller had been drinking alcohol—basically that "Redwood's word—without corroboration—can land a man in jail."  (Doc. No. 32 at 15.)  In support, Miller cites to cases wherein a duty was imposed on drug testing laboratories to those persons whose specimens were tested.  *See, e.g.*, *Quisenberry v. Compass Vision, Inc.*, 618 F. Supp. 2d 1223, 1228, n.2 (S.D. Cal. 2007); *Baker v. Abo*, No. Civ. 01-1248, 2003 WL 21639151, at *2 n.7 (D. Minn. 2003).  The cases cited by Miller, however, are distinguishable from the case at hand.  In addition, many of the decisions cited by Miller imposed a duty on drug testing laboratories with respect to the actual collection and/or testing of the specimen.  *See, e.g.*, *Baker v. Abo*, 2003 WL 21639151, at *1-2 (recognizing a duty of care with respect to the collection of the sample); *Chapman v. Labone*, 460 F. Supp. 2d 989, 1001 (S.D. Iowa 2006) (finding a duty of care with respect to the processing of a sample).

Other cases cited by Redwood have refused to impose additional duties on drug testing companies retained for the purpose of collecting and analyzing a specimen.  For example, in *Santiago v. Greyhound Lines, Inc.*, 956 F. Supp. 144, 154-55 (N.D.N.Y. 1997), the court recognized the distinction between the duty to competently collect and test specimens and other broad-sweeping duties.  956 F. Supp. at 154-55 (declining to impose additional duty on testing laboratory beyond the duty to test the sample according to applicable standards of due care).  The Court agrees with the line of cases that have declined to impose a duty of care on laboratories such as Redwood that go beyond the duty to act with reasonable care in the collection and testing of the specimen.  Here, Plaintiff does not allege that Redwood failed to act with reasonable care in the collection or testing of Miller's sample. And as explained above, it was Tri-County that interpreted the results it received from Redwood.  Accordingly, the Court concludes that Miller cannot establish the requisite element of duty to support a negligence claim and that claim is properly dismissed.

**III.    Class claims**

Miller also seeks to represent a class under Federal Rule of Civil Procedure 23. Redwood contends that Miller's class claims cannot survive because Miller fails to plausibly allege facts demonstrating the requirements under Rule 23(a) and (b).  In opposition, Miller simply asserts that a motion to dismiss is not the proper method to assert a challenge to his class claims.  The Court concludes that Miller's allegations regarding the prerequisites for class certification, including numerosity, typicality, commonality, adequacy, and predominance, are conclusory and fall short of providing a

factual basis to support his class claims.  Accordingly, his class claims are also properly dismissed.

For the reasons stated above, the Court concludes that Miller has not alleged a set of facts that entitle him to relief.  Accordingly, Miller's Amended Complaint is properly dismissed.

## CONCLUSION

Based on the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Redwood's Motion to Dismiss (Doc. No. [11]) is **GRANTED.**

2.      Miller's First Amended Complaint (Doc. No. [5]) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  September 15, 2011                s/Donovan W. Frank
                                          DONOVAN W. FRANK
                                          United States District Judge